The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the defendant-employer and plaintiff from June 7, 1999 through August 1999.
3. Defendant-employer is insured by Valley Forge Insurance Company for the claim brought by plaintiff in this action.
4. The date of plaintiff's alleged injury is August 2, 1999.
5. Plaintiff's medical records, as exchanged between the parties, as well as plaintiff's physical therapy records, may be received into evidence without further authentication or proof.
6. Valley Forge Insurance Company, pursuant to N.C. Gen. Stat. §97-18(d), has paid plaintiff $2,666.80 in temporary total disability compensation and had paid $856.50 in medical compensation for a total of $3,523.30 in compensation.
 ***********
Based on the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On August 6, 1999 defendant-employer Curlee Masonry, Inc. completed Form 19 Employer Report of Injury in which it reported that on August 2, 1999 at about 9:30 a.m. its employee, laborer Waldon Boger, had injured his "upper back" as he "was climbing scaffolding-something caught in back and was not able to work." Curlee reported that Mr. Boger reported his injury "immediately" to his supervisor Jeffrey Bumgardner. Curlee also reported that plaintiff started working for Curlee on June 7, 1999 at an hourly wage of $10.00, 8 hours a day, 5 days a week, for an average weekly wage of $400.00.
2. On August 27, 1999 Fay Lewis of Curlee's insurance carrier took a recorded telephone statement from Waldon Boger concerning his employment and how the accident occurred.
3. On September 28, 1999 CNA completed a Form 63 in which defendants accepted plaintiff's August 2, 1999 neck injury claim without prejudice to later deny his claim as permitted by N.C. Gen. Stat. § 97-18(d). On September 28, 1999 defendants agreed to pay plaintiff $266.68 per week in disability benefits, with the first payment to be made on September 16, 1999.
4. On October 27, 1999 plaintiff, now represented by counsel, submitted Form 18 to the Commission, alleging an August 2, 1999 neck injury "caused by my lifting and moving heavy load of bricks over scaffold brace." Plaintiff also alleged he may have suffered a ruptured cervical disc for which he may need surgery.
5. On November 1, 1999 the Commission received plaintiff's Form 33 hearing request because defendants denied his claim. He sought disability benefits and medical compensation.
6. On November 4, 1999 CNA claim specialist Fay Lewis completed Form 61 denial of claim and provided the following "detailed statement of its grounds for denying compensability of the claim" as required by G.S. § 97-18(d) (E42):
 "Employee did not sustain an injury by accident arising out of and in the course of employment.
Alleged injury did not occur at work.
 The incident described by the employee is not the proximate cause of the alleged injury.
 Any other facts that may become available at a later date."
7. On June 27, 2000 plaintiff filed a motion under N.C. Gen. Stat. § 97-25 seeking Commission approval of Winston-Salem neurosurgeon William O. Bell to assume plaintiff s care for his neck injury. Plaintiff's initial treating physician, Dr. Joseph P. Zuhosky of the Miller Clinic in Charlotte testified, and the Full Commission finds as fact, that it was appropriate for plaintiff to seek other treatment because he had moved to the Winston-Salem area and Charlotte was too far away for regular treatment.
8. On December 20, 1989, while at work for Dixie Furniture in Lexington, N.C., plaintiff fell off a ladder and injured his lower back. He received total disability compensation benefits for about 4 months and was awarded additional compensation for a 5 percent permanent loss to his back under N.C. Gen. Stat. § 97-31(23). This was in IC No. 005013.
9. On January 8, 1999, while at work for 4c's Food Service in Charlotte. N.C., plaintiff slipped on a wet floor and fell, injuring his lower back. He was paid total disability compensation benefits beginning January 8, 1999. An April 1999 lumbar MRI did not reveal any significant lumbar abnormalities. On May 4, 1999 plaintiff told Dr. Dyer that on April 26, 1999 he fell in the shower and his back pain is hurting worse since then. On May 25, 1999 neurosurgeon Dyer examined plaintiff and found him to be doing better and not having as much back pain with better flexibility and rotation. Dr. Dyer then released him to "return to work on Monday, May 31, 1999 without restriction." Plaintiff's benefits ended on May 31, 1999.
10. On June 7, 1999 plaintiff was hired by Curlee Masonry as a laborer. Jeff Bumgardner, Curlee Masonry's job superintendent and working foreman hired plaintiff to work as a laborer at Crown Ridge Apartments in Charlotte, N.C. On this job there were bricklayers or brick masons, laborers, and a forklift driver. A laborer's job is "just supplying [brick masons] with brick, mortar, and anything that we needed for the brick masons."
11. The project involved building a brick exterior two stories high using a scaffold to get to the second floor of the apartments. On the scaffold were crossties or cross bars located between the inside and outside of the scaffold. The brick mason worked on the inside part of the scaffold next to the building, and the laborer worked on the outside part of the scaffold with the crossties between them.
12. Plaintiff described the injury as follows:
 "That day was like any other day. I stayed about three to four blocks from the job and I walked to work. I get in about six thirty and I made the mud. And I made sure everything was ready when Jeff and the other brick masons came in. And I was helping — I remember I was — I was helping Keith, also, on his scaffold. Like I said, it was — there wasn't but about three big brick masons there and about three laborers. And I was helping Keith and I was going back and forth from the scaffolding. And I had both the scaffolding pretty much stocked up and I remember I — I walked — I climbed down from Keith's scaffold and went over to Jeff's scaffolding because the forklift driver was getting ready to put a band of bricks up. And I got up to Jeff's scaffold and I broke the band of bricks. Once they put the — the brick up on the scaffolding, you have to make sure that they don't fall so you have to sturdy the bricks. And I cut the band off the bricks. I got my tongs and I put the tongs on the brick, which is the claw, and I lift. And you've got to understand, on the scaffolding, they've got these crossbars that help keep them stabilized. I was working on the outside and Mr. Bumgardner, he was working on the inside. Bo once I was coming with the bricks, I was stretched out and I was trying to maneuver through the crossbar. That's when — when I felt a pop in my neck. And I just — it — it was, like, lightning hit — sat down on my neck. And I dropped the bricks and I hollered out to Jeff. His back — he was laying bricks and his back was turned. And I hollered out and I said, "Oh, I hurt my neck," and I dropped to my — to my knees. And that's when Jeff called for the forklift driver to come and get me.
Q. Did he say anything to you?
 A. He said, "How did you hurt your neck?" He said, "How did you hurt yourself?" I said, "I think I hurt my neck," just like that. And that's when he hollered for the forklift driver to come over.
Q. What did you feel like?
 A. I felt bad. I couldn't move, I couldn't even move. It — it was a pain I've never felt before in my life. And that — I dropped the bricks and that's when I hollered.
 Q. Were you having pain any place else besides in your neck?
 A. It sunk down in my arms and I couldn't move my arms. My arms and — and down — down into my back. I couldn't move.
 Q. All right. And then the forklift driver came and then you — you were on the second floor —
A. Yeah.
Q. ---when this happened?
 A. Approximately the second and third floor. Like Mr. Bumgardner said, they were doing piers. And it really was — basically, it's an L shape and you walk on this — you work — you lay brick on this side and then you walk on this side and lay brick.
Q. But you were up on the second story?
A. Yeah, the second story.
 Q. And what did you do then? Did you — did you finish work that day or you didn't finish working?
 A. No, uh-uh (no). This was — this was approximately about eleven thirty that morning. And, like I said, I was hurting. I couldn't move, I couldn't move.
Q. Well, did you go home then?
 A. No. Well, the forklift, he — it took him about ten minute's to get over there. He got over there and I couldn't get on the forklift `cause I couldn't move. And I remember Jeff helping me up on — on the forklift.
Q. Then you got to the ground. Then what did you do?
 A. I couldn't get off the forklift. The forklift driver, he got off the lift and he helped me get off the forklift. And I also remember when we was up on the scaffolding, Mr. Bumgardner asked me did I want to go to the emergency room and I said that I — "No, I'll just — just go home," `cause I figured I'd be all right the next morning. And once we got down on the ground, I couldn't — like I said, I couldn't get off the forklift. I was holding it like that. I thought I was going to fall off coming down, I was shaking so bad. And once we got to the ground, like I said, the forklift driver had to get off the forklift to help me get off. And Chad — Jeff had Chad to take me home.
 Q. And did you contact anybody or did you go the emergency room or do anything that night of August 2nd?
 A. No, uh-uh (no). Like I said, I — I thought that I would be better the next morning so I didn't —
Q. What happened, then, the morning of August 3rd?
 A. I got up August 3rd — well, I was laying in the bed and it — it was just so much pain, I couldn't — I couldn't even move my arms or my neck. So I had my roommate — I give him the phone and he called Jeff — called Jeff that morning around six thirty.
 Q. How did — how did you call Jeff? Did he have a — did you call him at home?
 A. I called him — no. I called him on his cell phone. I had his cell phone number. And I told him that I wouldn't be able to come in that morning because I I just was in so much pain and I couldn't — I couldn't move. I couldn't move my neck nor my arms.
 Q. What did you do then? Did you do anything on August the 3rd then?
A. No, uh-uh (no). I just laid in bed.
Q. What did you do on August 4th?
 A. August 4th, I called Jeff again and told him that, "I — I think I need to go to the emergency room and I wasn't feeling no better." And he — he said, "Well, go ahead and go on to the emergency room," and I went to the emergency room that morning.
Q. So you first sought medical attention on that date?
A. Yes. Yes, I did.
Q. And where was that?
A. University Hospital on Harris Boulevard.
 Q. And what part of your — did you — did you tell anyone there — did you say anything to anyone there why you had come there, for what reason?
 A. Yes. I told them that I had got hurt on the scaffold.
Q. Did you tell them what part of your body?
A. Yes. My neck — I hurt my neck lifting bricks.
Q. Were you examined?
A. Yes.
 Q. And were you — did you — did you get any kind of a written note from anyone?
 A. Yes. The emergency room doctor gave me an out-of-work note and told me if I —
Q. No, don't tell me. You can't say what he said.
 A. Oh, okay. He gave me an out-of-work note and wrote me a prescription.
Q. For what?
 A. For some pain medication. And told me to go home and rest and if I didn't feel no better, to call these — these clinics.
Q. The Miller Orthopaedic Clinic?
 A. The Miller Orthopaedic Clinic and — it was several of them. And a lot of them that I called, I couldn't see them up `til September. It was September before they'd be able to see me. And when I called Miller, they — they accepted me on the eighteenth.
 Q. Did you have any contact with Mr. Bumgardner after you went to the hospital on the fourth?
A. Yes, uh-huh (yes).
Q. What did you do?
 A. I — I called Jeff and — my thinking, I — I was thinking that I could go back to work and maybe do — do something. And I called Jeff on the phone and he said, "Well, maybe you could do some light duty like help make mud."
Q. Did you ever give him the out-of-work slip?
A. Yes. I gave him the out-of-work slip.
 Q. And then when did you — when did you — that was on the 4th or the 5th of August?
 A. Yes. I gave the out-of-work note to Jeff and he just told me to go home and take it easy.
 Q. When did you have contact with Mr. Bumgardner after August 5th?
 A. I called him — I called Jeff again and, like I said, I asked him maybe I could come to work and — my thinking was come to work and do something, you know, because I really needed to work financially. And he said, "Well, maybe you can come in and make mud or whatever — something like that."
13. Plaintiff's injury is compensable because it constituted a specific traumatic incident of the work assigned. Dr. Zuhosky testified, and the Full Commission finds as fact, that the incident with the bricks and the scaffold more likely than not caused the injury for which he was treated, initially diagnosed as cervical strain and later thought to be cervical radiculopathy. Defendants declined to pay for a CT scan ordered by Dr. Zuhosky to determine the extent of plaintiff's injury, so the scan was not done.
14. Plaintiff was born on December 26, 1959. He is unmarried and has an adult daughter. In 1978 he graduated from Lexington High School in Lexington, N.C. He has worked at various unskilled physical type jobs since about 1975 except for 1988 and 1997-1998 when he was in prison.
15. On August 4, 1999 plaintiff went to Charlotte's University Hospital with a chief complaint of "upper back pain". The ER physician, Timothy Hall, in the Emergency Physician's Report wrote the chief complaint was "upper thoracic — felt pop 2 days ago while-after climbing". His diagnosis was "Thoracic Strain". The triage nurse recorded plaintiffs chief complaint as "upper back pain" sustained on Monday August 2, 1999 when he "felt a pop when climbing up a scaffold" and "felt pop, twinges to area," that is, "upper back/neck area". The physician prescribed rest, an ice pack, "gentle motion to avoid stiffness, 3 Advil each 6 hrs with food," Flexeril and Vieodin, advised plaintiff to call an orthopedist, and prescribed "no lifting greater than 10 lbs. this week".
16. On August 18, 1999 plaintiff went to the Miller Clinic for treatment. This was the earliest appointment he could get. He filled out a questionnaire wherein he mistakenly put the visit date as "9-18-99" and also he wrote that on "9/2/99" [should be 8/2/99] while at work for Curlee Masonry as a laborer he was hurt, which he described as "sound[ing] like a bone popped in the top of back". The history in the medical record dated August 18, 1999 is as follows:
 Plaintiff presents today for evaluation of his cervical spine. The patient is a 39-year old gentleman who gives a history of having been working as a laborer for a masonry company and when he was carrying some bricks up, he felt a pop into his cervical spine. This occurred on August 2, 1999. He had a sudden onset of numbness and tingling in both hands. He did remain off work for a while and did try to return, but has had a recurrence of symptoms. He has been in the emergency room, from where he is referred today for evaluation. He denies any previous problems. He states that he has had some transient numbness into the arms, but it seems to be dissipating. He has limited motion, complains of headaches. No previous problems.
Diagnosis: Cervical strain with radiculopathy.
17. Plaintiff was totally disabled from August 2, 1999 through October 15, 1999; that is, because of his compensable injuries, he was unable to earn any wages during that period. On November 4, 1999 plaintiff found employment at the Golden Corral in Winston-Salem, earning about as much each week as he earned at Curlee Masonry. Plaintiff needs an MRI of his neck and possible treatment by a neurosurgeon so he can get better. The primary relief he seeks is needed medical treatment.
18. Plaintiff's average weekly wage was $400.00, yielding a compensation rate of $266.67.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission makes the following additional:
 CONCLUSIONS OF LAW
1. On or about August 2, 1999, plaintiff sustained an injury as the direct result of a specific traumatic incident of the work assigned while in the course and scope of his employment. N.C. Gen. Stat. § 97-2(6).
2. Defendants are responsible for all medical treatment arising out of plaintiff's injury, past, present and future, to the extent that such treatment might lessen the period of disability, effect a cure, or provide relief. N.C. Gen. Stat. § 97-25.
3. The Full Commission, in its discretion, is empowered to order a change in treatment and/or treating physicians. A change is clearly appropriate here. Plaintiff's motion for change of physicians was timely made. Additionally, since this case was ultimately denied by defendants, defendants did not have the right to direct medical care. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER and AWARD
1. Plaintiff's motion under N.C. Gen. Stat. § 97-25 seeking Commission approval of Winston-Salem neurosurgeon William O. Bell to assume plaintiff s care for his neck injury is hereby ALLOWED. Defendants are ORDERED to pay Dr. Bell's reasonable fees, including a CT scan recommended by Dr. Zuhosky.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injuries, including all amounts heretofore paid by plaintiff or by any entity in his behalf and all future medical expenses related thereto, to the extent that such treatment might lessen the period of disability, effect a cure, or provide relief.
3. Defendants shall pay to plaintiff disability compensation at the rate of $266.67 per week from August 2, 1999 through October 15, 1999. That amount having accrued defendants shall pay it in a lump sum, with interest at 8 percent per year, from June 27, 2000 until paid. Defendants shall pay all interest to plaintiff. Defendants shall pay three quarters of the lump sum to plaintiff and one quarter of the lump sum directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This 1st day of October 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/________________ BERNADINE BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER